## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ROY R., | |
| Plaintiff, | No. 19 CV 1687 |
| v. | |
| KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY,[1] | Magistrate Judge McShain |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Roy R. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, the Court denies Plaintiff's motion for summary judgment [17],[2] grants the Acting Commissioner of Social Security's (Commissioner) motion for summary judgment [26] and affirms the Commissioner's decision denying Plaintiff's application for benefits.

### Procedural Background

In April 2015, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of July 15, 2009. [6-1] 83-85.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [6-1], which refer to the page numbers in the bottom right corner of each page.

Plaintiff's claim was denied initially and on reconsideration. [*Id.*] 83-84; 123-124. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on August 25, 2017. [*Id.*] 48. In a decision dated January 25, 2018, the ALJ found that plaintiff was not disabled. [*Id.*] 48-56. The Appeals Council denied review on January 8, 2019, [*id.*] 1-7, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely appealed to this Court [1], and the Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[3]

## Factual Background

Plaintiff, who is now fifty-eight years old, sought disability benefits due to a broken clavicle, right shoulder pain, stage 2 throat cancer, tendonitis of his bilateral elbow, back pain, right knee pain, and a left ankle fracture. *See* [6-1] 83-86.[4] Before applying for benefits, Plaintiff worked in construction as a carpenter for over 20 years. [*Id.*] 278.

### I. Plaintiff's Medical Impairments and Treatment History

### A. Plaintiff's Musculoskeletal Conditions

The medical record evidence establishes that Plaintiff has a history of several musculoskeletal impairments, including a right clavicle fracture, elbow tendonitis, back pain, right knee fracture, and a left ankle fracture.

---

[3] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. [8].

[4] Plaintiff's April 2015 application was actually his second Title II application: Plaintiff had previously filed an application in October 2011, which was denied in December 2011. As discussed further, *infra*, Plaintiff did not file a timely appeal of this previous application, and the ALJ found no basis for reopening the prior determination. [*Id.*] 48-49.

On August 1, 2009, Plaintiff sustained a right comminuted clavicle fracture when he fell while moving building materials and hit his collarbone on the bumper of a truck. [*Id.*] 447-448. Plaintiff underwent an open reduction and internal fixation surgery on August 12, 2009, to repair the fracture, performed by Dr. Jonathon Wigderson, D.O. [*Id.*] 477-478. The records suggest Plaintiff recovered gradually over the next four months. *See, e.g.,* [*Id.*] 460 (noting that, as of October 2009, the "[b]ony structures are in good alignment with evidence for healing, though not yet complete"); 453 (noting an opinion from Dr. Michael Arthofer in December 2009 that "no new acute bony pathology is seen involving the right clavicle" and "[s]ome slight progressive healing"); *but see also* [*id.*] 434 (noting Dr. Wigderson's opinion that he "did not see any definitive bridging bone or indication of healing"). Plaintiff also reported in December 2009 that he was doing better after the surgery, though he still was experiencing discomfort in his shoulder when he put pressure on it, such as when he was sleeping. [*Id.*] 434.

After December 2009, the records related to Plaintiff's recovery from the surgery and his associated shoulder pain are more sporadic. There are two passing references in April and June 2010 treatment notes from Dr. David Cailmag, D.O., that suggest Plaintiff was experiencing ongoing shoulder pain due to his "clavicle injury not healing." [*Id.*] 525-526. It is unclear from the notes however whether Dr. Cailmag performed any examination himself or was simply reporting Plaintiff's subjective statements. In February 2011, Plaintiff reported to his primary care physician, Dr. Tisa Morris-Christian, that he was experiencing pain in his right

clavicle. [*Id.*] 623. He reiterated those pain complaints to Dr. Morris-Christian in November and December 2011, indicating that he sometimes experienced pain radiating up his entire arm and causing numbness, and that it was making it hard for him to do household chores. [*Id.*] 980-983. Dr. Morris-Christian recommended that Plaintiff see an orthopedic specialist, which he did in January 2012. [*Id.*] 980-983; 1004-1005. The orthopedist performed an electromyography (EMG) and nerve conduction study which returned largely normal results: the orthopedist found evidence of mild carpal tunnel syndrome on the right side, but no evidence of neuropathy or brachial plexopathy. [*Id.*]. Plaintiff returned to Dr. Morris-Christian after this evaluation and requested a referral for another orthopedist and pain medication. [*Id.*] 984. Dr. Morris-Christian prescribed Norco for Plaintiff's pain, and referred him to a different orthopedist. [*Id.*] 985. The records do not indicate that Plaintiff followed up with the second orthopedist or that he pursued any further treatment for his mild carpel tunnel syndrome.

Regarding Plaintiff's elbow pain, at a January 13, 2014 visit with Dr. Morris-Christian Plaintiff reported that he had started experiencing a throbbing pain in his left elbow, that became a shooting pain when he moved it. [*Id.*] 990. Dr. Morris-Christian ordered x-rays which showed mild degenerative osteoarthritis. [*Id.*] 1002. Dr. Morris-Christian's notes indicate that she recommended Plaintiff consider physical therapy, but the records do not contain any evidence that Plaintiff pursued physical therapy or any other treatment for his elbow. Plaintiff testified at the hearing that there was a physical therapist who took his insurance, but that the

4

therapist was far away and Plaintiff could not afford to drive there. [*Id*.] 1150. Plaintiff further testified that he did not ask to go back to an orthopedist or pursue other options such as a revision surgery. [*Id*.] 1157. When the ALJ asked why, Plaintiff initially indicated it was for financial reasons, but when the ALJ noted that Plaintiff did have insurance, Plaintiff responded only "I'm not sure." [*Id*.].

Regarding Plaintiff's neck and back pain, at the same January 13, 2014 visit with Dr. Morris-Christian, Plaintiff reported in passing that he was experiencing lumbar pain from time to time, and requested an x-ray. [*Id*.] 991. Dr. Morris-Christian ordered the x-ray, which showed "mild multilevel loss of intervertebral disc space with marginal disc osteophyte complexes and facet hypertrophy resulting in a mild to moderate foraminal stenosis most pronounced at L4-L5 and L5-S1." [*Id*.] 1003. The record contains no further evidence that Plaintiff sought any additional treatment for his back pain. In February 2017, Plaintiff reported to Dr. Morris-Christian that his back was bothering him, and that he was supposed to follow up with a specialist after the results of his imaging in 2014, but "never got around to it" and the referral had expired. [*Id*.] 1098. The records don't indicate that Plaintiff sought any treatment after raising his backpain in February 2017.

Finally, the records indicate that Plaintiff fractured his right knee in July 2014, [i*d*.] 1077, and separately refer to Plaintiff having a left ankle fracture at some point in the "remote past," though the records do not indicate when that may have been. [*Id*.] 1055. However, other than these isolated references, there are no records indicating that Plaintiff sought any ongoing treatment for either fracture or that he

complained of ongoing pain or effects from them.

### B. Plaintiff's Throat Cancer

In early 2010, Plaintiff started having difficulty swallowing and was experiencing throat pain. [*Id.*] 637. This pain led to a diagnosis of epiglottis cancer in July 2010. [*Id*]. Plaintiff was treated with radiation over the course of the next several months until September 2010. [*Id*]. By October 2011, his physician, Dr. Jason Suh, noted that Plaintiff was doing well and there was "no evidence of a recurrence." [*Id.*] 638. Plaintiff continued to receive regular follow up examinations over the course of the next several years, all of which continued to show no evidence of recurrence. *See, e.g.,* [*id.*] 637-38, 897, 901, 1019-20, 1088-89. At the hearing, Plaintiff testified that he continued to have ongoing problems eating, breathing, and swallowing as a result of his throat cancer. [*Id.*] 52.

### C. Plaintiff's Depression

Finally, the records contain evidence that Plaintiff has been treated for depression. Plaintiff reported to Dr. Morris-Christian in February 2011 that he was experiencing depression since his diagnosis of throat cancer, and that he had been unemployed and unable to find a job, and was having difficulty concentrating. [*Id.*] 623. Dr. Morris-Christian prescribed Zoloft, but the record does not contain any further evidence of treatment for depression outside of prescriptions for various medication for depression and anxiety. *See, e.g.,* [*id.*] 980 ("he does not want to see a psychiatrist."). Although Plaintiff continued to mention feeling depressed at some future appointments, the records are unclear as to how consistently Plaintiff took

medication for his depression. *See* [*id.*] at 986-987; 994-995. For example, a March 2016 note indicates that Plaintiff had not been taking his anti-anxiety medication twice daily as prescribed, [*id.*] 1108, and as of February 2017, Plaintiff reported to Dr. Morris-Christian that he was no longer on an antidepressant and was taking his anti-anxiety medication "here and there." [*Id.*] 1098.

## II.  Medical Opinion Evidence

### A. State Agency Consultants

The record contains opinions from three state agency consultants. In August 2015, at the initial application level, Dr. Ranga Reddy, M.D., found that Plaintiff's back and neck pain, cancer, and lower extremity fractures constituted severe impairments, and that Plaintiff was capable of medium work with certain postural limitations. [*Id.*] 67-71. At the reconsideration level, in February 2016, Dr. Kristin Jarrard, M.D., found Plaintiff's osteoarthrosis, cancer, and head and neck pain were severe impairments and, like Dr. Reddy, found that Plaintiff was capable of medium work. [*Id.*] 93-103. Also at the reconsideration level, a state psychological consultant, Dr. Erika Gilyot-Montgomery, offered her opinion that Plaintiff's medically determinable mental impairments of depression were not severe and caused no more than mild functional limitations. [*Id.*] 113-114.

### B. Plaintiff's treating physician Dr. Robert Boll

In July 2017, one of Plaintiff's treating physician's, Dr. Robert Boll, filled out a "Residual Functional Capacity Questionnaire" form in which he offered his opinion that Plaintiff suffered from cervical myelopathy and chronic pain. [*Id.*] 1121-26. Dr.

Boll had treated Plaintiff on two occasions, in April and May 2017. [*Id.*] 1112, 1117. Dr. Boll noted on the questionnaire form that that Plaintiff "walks with a cane" and had "4-5/5 strength at best in extremities." [*Id.*] 1121. Dr. Boll also marked a box on the form indicating that he believed Plaintiff's symptoms would "frequently" interfere with the attention and concentration needed to perform simple work tasks. [*Id.*] 1122. Notably, Dr. Boll also noted that he had "not examined [Plaintiff] in such a way as to be able to describe specific physical limitations." [*Id.*] 1124.

## III. ALJ's Opinion

On January 25, 2018, the ALJ denied Plaintiff's claim for benefits. [*Id.*] 48-56. In her written decision, the ALJ relied on the standard, five-step analysis for deciding disability claims.

As a threshold matter, the ALJ noted that Plaintiff had previously had a Title II application denied on December 5, 2011, but had failed to timely appeal. [*Id.*] 48. In his pre-hearing brief, Plaintiff made several arguments as to why he had failed to appeal the negative determination on his prior application, but the ALJ found that none of his purported reasons demonstrated the "good cause" that was necessary to reopen that prior determination. [*Id.*]. Therefore, the ALJ found that the December 5, 2011, determination was final and that, since Plaintiff's alleged onset date of July 15, 2009, overlapped with the previously adjudicated period, the ALJ was only bound to consider the "unadjudicated period beginning December 6, 2011." [*Id.*]

Proceeding to the merits of Plaintiff's claim, at step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 15, 2009. However,

at step two, the ALJ found that Plaintiff did not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months. [*Id*] 51. The ALJ found that Plaintiff did have several medically determinable impairments that could reasonably be expected to produce his alleged symptoms, such as his alleged chronic pain. [*Id.*] 52. However, the ALJ also found that Plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." [*Id.*] 52.

In support of this finding, the ALJ proceeded to review the medical evidence related to Plaintiff's throat cancer, fractured clavicle, back pain, elbow pain, right knee fracture, and depression, and his treatment for those conditions. *See generally* [*Id.*] 52-54. The ALJ found that the objective medical evidence in the record did not show that his conditions caused more than mild work-related limitations. [*Id.*] 52-53. Regarding Plaintiff's throat cancer, the ALJ noted that his cancer had been in remission since 2011 with no signs of recurrence. [*Id.*]. The ALJ further found that Plaintiff had not consistently pursued treatment, outside of medication, for any of his musculoskeletal conditions, nor had he done so for his depression. [*Id.*] 53. The ALJ further observed that Plaintiff's "physical examinations throughout the relevant period have been largely unremarkable, showing full muscle strength, intact sensation, normal reflexes, no edema, and a normal gait." [*Id.*] 53-53 (citing [*id.*] 886-975; 976-1007; 1026-1034; 1036-1082; 1097-1109). The ALJ took particular note of

the results of a consultation exam Plaintiff had in July 2015 with Dr. ChukwuEmeka Ezike, M.D. [*Id.*] 53 (citing [*id.*] 1008-1011). The ALJ noted that, other than observing some mild tenderness in Plaintiff's right clavicle and elbow, Dr. Ezike's exam was "largely unremarkable." [*Id.*]. In particular, the ALJ noted that Dr. Ezike found that Plaintiff had a "non-antalgic gait, normal grip strength, the ability to grasp and manipulate objects, normal range of motion, negative straight leg raises, normal motor strength, normal reflexes, and intact sensation." [*Id.*]. The ALJ stated that Plaintiff's "mental status examination was also unremarkable," and that Plaintiff was "alert and oriented, with normal behavior, appearance, and affect" and that Dr. Ezike noted "no signs of depression, agitation, irritability, or anxiety." [*Id.*]. Additionally, with respect to Plaintiff's mental functioning, the ALJ observed Plaintiff had largely normal examinations throughout the relevant period, and was capable tasks such as handling money and driving that demonstrate adequate mental functioning. [*Id.*] 55 ("even minimal operation of a motor vehicle requires substantial attention and concentration, in order to understand, remember, and carry out complex functions, and to integrate such complex functions into independent situational awareness and projective judgn1ent every few seconds").

Regarding Plaintiff's subjective statements, in his application and in his hearing testimony, about the intensity and limiting effects of his symptoms, the ALJ found they were "inconsistent with the objective medical evidence, his course of treatment, his statements to medical providers about his impairments, and his daily activities." [*Id.*] 54. The ALJ noted that the record showed that Plaintiff had received

very little sustained treatment for most, if not all, of his claimed impairments. [*Id*].
For example, the ALJ noted that Plaintiff received no treatment from a back
specialist and let a referral expire, nor did he pursue physical therapy for his shoulder
or elbow pain. [*Id*.] 53-54. The ALJ acknowledged that, at the hearing, Plaintiff
indicated that at least some of his lack of treatment was the result of "difficulties
finding providers covered by insurance." [*Id*.] 54. The ALJ went on to find, however,
that the record showed that Plaintiff "still received care from his primary care
provider, often without mentioning any of the conditions discussed above." [*Id*.]. The
ALJ repeated her observation that the examinations that Plaintiff did have were
"largely unremarkable," and noted that the record contained "no opinions during the
relevant period from any treating or examining source physician indicating that the
claimant is disabled." [*Id*.].

With regard to the opinion evidence, the ALJ gave "little weight" to the
opinions of the state agency medical consultants Dr. Reddy and Dr. Jarrard, because
they did not examine Plaintiff or have the additional medical evidence the ALJ
received at the hearing level. [*Id*.]. The ALJ further found that the record as a whole,
for the reasons discussed above, did not support their opinion that Plaintiff had
severe impairments. [*Id*.]. The ALJ did give "great weight" to the opinion of the state
agency psychological evaluation by Dr. Gilyot-Montgomery. [*Id*.]. The ALJ found Dr.
Gilyot-Montgomery was a "highly qualified psychologist who is considered an expert
in the evaluation of the medical issues in disability claims," and that her opinion was
consistent with the record evidence that Plaintiff's psychiatric symptoms have "been

largely controlled with conservative treatment." [*Id.*].

Finally, the ALJ gave "no weight" to the opinion of Dr. Boll. [*Id.*] 54-55. The ALJ noted that Dr. Boll had only seen Plaintiff on two occasions and that, although Dr. Boll offered an opinion that Plaintiff's pain would "frequently interfere" with his attention and concentration needed to perform even simple work tasks, Dr. Boll had declined to offer any opinion on Plaintiff's functional limitations because he had not examined Plaintiff such that he could offer an opinion. [*Id.*]. The ALJ further stated that the record contained no examination notes from Dr. Boll, and therefore it was not clear "what, other than the claimant's reporting, Dr. Boll based his opinion on." [*Id.*]. The ALJ therefore gave Dr. Boll's opinion "no weight," in light of the "lack of support and very short treating relationship." [*Id.*]

The ALJ ultimately concluded that none of Plaintiff's physical or mental impairments, considered singly or in combination, significantly limited his ability to perform basic work activities. Plaintiff therefore did not have any severe impairment or combination of impairments, which necessitated a finding of not disabled. [*Id.*] 55-56.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted). *See also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("When an ALJ recommends that the agency deny benefits, it must first 'build an accurate and logical bridge from the evidence to the conclusion.'") (internal citation omitted).

## Discussion

Plaintiff argues that the ALJ's decision should be remanded for further proceedings, because the ALJ failed to build the requisite "logical bridge" from the evidence to her conclusion at step two that Plaintiff does not have a severe impairment or combination of impairments. [18] 8-15. In addition to generally arguing that the ALJ's opinion was not supported by substantial evidence, Plaintiff claims that the ALJ committed several legal errors supporting a remand. Specifically, he maintains that: (1) the ALJ impermissibly played doctor by dismissing the opinions of the two state agency medical consultants; (2) the ALJ erred because the sequential evaluation should have continued past step two and his residual functional capacity ("RFC") assessment supports a finding of disability; (3) the ALJ erred in affording treating physician Dr. Boll's opinion no weight; and (4) the ALJ's negative credibility assessment regarding Plaintiff's testimony about his condition was patently wrong.

The Court will address each of Plaintiff's arguments below. Ultimately, on careful review of the parties' briefing, the ALJ's opinion, and the administrative record, the Court finds that substantial evidence supported the ALJ's decision and that the ALJ did not commit any errors warranting remand.

## I. Substantial evidence supports the ALJ's determination at step two that Plaintiff does not have a severe impairment or combination of impairments.

At step two of the disability evaluation process, an ALJ determines whether a claimant's medically determinable impairments, individually or in combination, are

"severe." *See generally Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); 20 C.F.R. § 404.1521. A severe impairment is an impairment or combination of impairments that "significantly limit[s] [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). The regulations implementing the Social Security Act state that "basic work activities" include walking, standing, sitting, pushing, and handling; understanding, carrying out, and remembering simple instructions; and responding appropriately to supervision and co-workers. *See* 20 C.F.R. §404.1522(b). Conversely, an impairment is not severe when the evidence establishes "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." Social Security Ruling ("SSR") 85-28 (S.S.A. 1985). If the ALJ determines that a claimant does not have a severe impairment or combination of impairments, the analysis stops at step two and the ALJ finds the claimant is not disabled. *See, e.g., Zims v. Chater,* No. 94 C 3775, 1995 WL 571824, at \*5 (N.D. Ill. Sept. 22, 1995).

Here, after conducting a review of the medical and opinion evidence related to all of Plaintiff's claimed impairments, the ALJ found that Plaintiff's medically determinable impairments—broken clavicle, right shoulder pain, status post stage two throat cancer, tendonitis of bilateral elbow, back pain, right knee pain, and status post left ankle fracture—did not significantly limit Plaintiff's ability to perform basic activities, and therefore were not severe individually or in combination. [6-1] 48-56.

As a threshold matter, however, the Court will address Plaintiff's general

assertions that (1) the ALJ failed to build the requisite "logical bridge" from the evidence to her conclusion at step two, and (2) the ALJ committed a legal error by failing to continue with the sequential evaluation and determine his RFC, at which point the ALJ should have found Plaintiff was incapable of performing light work. The Court is not persuaded by either argument.

### A. The ALJ built an accurate and logical bridge to her conclusion.

First, the Court finds that the ALJ built the requisite logical bridge between the medical evidence and her conclusion that none of Plaintiff's impairments, individually or in combination, were severe. Regarding Plaintiff's musculoskeletal impairments, the ALJ discussed the medical record evidence related to each of Plaintiff's specific complaints, the treatment and lack thereof, as well as the affirmative evidence of Plaintiff's largely unremarkable physical examinations and determined that the evidence did not support Plaintiff's claims that they caused anything more than mild work-related limitations. [6-1] 52-53.

Specifically, with respect to Plaintiff's clavicle fracture and shoulder pain, the ALJ found that the record evidence showed that Plaintiff generally recovered well between his August 2009 surgery and December 2009, and that, although Plaintiff complained of pain in 2011, a subsequent EMG exam revealed only mild-carpal tunnel syndrome. [*Id.*] 53. The ALJ further noted that Plaintiff did not appear to receive any further treatment for this carpal tunnel syndrome, such as physical therapy. [*Id.*]. Regarding Plaintiff's elbow pain, the ALJ noted that 2014 x-rays showed mild degenerative osteoarthritis, and that Plaintiff did not seek further

treatment for the condition. [*Id*]. Similarly, for Plaintiff's knee fracture in 2014, the ALJ noted no evidence of treatment. [*Id*]. Regarding Plaintiff's back pain, the ALJ noted that 2012 and 2014 imaging studies showed "mild" degenerative changes, but no evidence of neuropathy or radiculopathy. [*Id.*]. Again, the ALJ noted that the record showed a lack of treatment, and that Plaintiff had let a referral for a back specialist expire. [*Id.*]. Additionally, the ALJ found it notable that Plaintiff's physical examinations throughout the relevant period were "largely unremarkable," showing full muscle strength, normal reflexes, and normal gait. [*Id.*] 53 (citing [*id.*] 886-975; 976-1007; 1026-1034; 1036-1082; 1097-1109). The ALJ took particular note of a consultative examination in 2015, right in the middle of the relevant time period, where, outside of some "mild tenderness" of the back, Plaintiff's examination was normal. [*Id.*] 54 (citing [*id.*] 1008-1011).

The ALJ conducted a similar review related to Plaintiff's throat cancer and depression. Regarding the former, the ALJ noted the record evidence that showed that, although Plaintiff required a period of treatment for his cancer, by October 2011 he appeared to be doing well, and over the course of Plaintiff's repeated follow-up appointments there were no signs of recurrence. [*Id.*] 52-53 (citing [*id.*] 637). Regarding Plaintiff's depression, the ALJ found that Plaintiff had only pursued the conservative treatment of medication, with no other treatment such as counseling, outpatient treatment, or treatment by a psychiatrist. [*Id.*] 53. The ALJ also noted that at office visits, the claimant was generally alert and oriented, with normal speech and "appropriate thought content." [*Id.*] 53-54 (citing [*id.*] 888-975). The ALJ's

opinion includes a detailed analysis of Plaintiff's mental functioning, using what are known as the "paragraph B" criteria found in regulations. [*Id.*] 55-56 (citing 20 C.F.R. § 404, Subpt. P, App. 1.). The ALJ noted that Plaintiff was able to handle money and drive, the latter of which demonstrated adequate mental functioning in the area of understanding, remembering, and applying information. [*Id.*]. The ALJ further found that the record evidence demonstrated that Plaintiff had no more than mild limitations in interacting with others or concentration, in light of the examination notes throughout the period which indicated that Plaintiff had no issue getting along with others, and was alert and oriented during examinations with no issues maintaining concentration. [*Id.*]. The ALJ again noted that Plaintiff's ability to drive showed an adequate ability in concentration and persistence. [*Id.*].

The Court summarizes the ALJ's analysis here at some length to demonstrate that the ALJ did exactly what she was required to do: she reviewed and discussed the relevant and objective medical record evidence related to all of Plaintiff's claimed medically determinable impairments and found that, while those impairments were documented, there was not sufficient evidence in the record to support Plaintiff's claim that they caused significant limitations on his ability to perform basic work activities. Rather, the ALJ found the evidence, including the significant amount of records showing largely normal physical examinations throughout the relevant time period, indicated that Plaintiff's conditions caused no more than mild limitations. Whether or not the Court agrees with that conclusion is irrelevant, as what matters is that the ALJ built an "accurate and logical bridge" from the evidence to her

conclusion that Plaintiff did not have a severe impairment or combination of impairments. *See Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008).

Plaintiff argues that the ALJ erred in concluding the combination of his impairments was not severe. In addition to Plaintiff's specific arguments related to the ALJ's handling of the opinion evidence and her credibility determination, which are discussed further below, Plaintiff also generally suggests that the ALJ's opinion was not supported by substantial evidence, given the record evidence documenting his impairments and severe limitations.[5] For example, Plaintiff notes that in 2011, he reported to his primary care physician that he had "continued pain in his right shoulder" that made it difficult to perform household chores, such as "carrying a laundry basket." [18] 9 (citing [6-1] 980-982). Plaintiff further argues that the ALJ "failed to confront significant evidence" showing that, as of December 2009, Dr. Wigderson found no "definitive bridging bone or indication of healing" of Plaintiff's clavicle. [*Id.*] 15 (citing [6-1] 434).

However, the fact that there may be some record evidence contrary to the ALJ's ultimate conclusion is not itself a basis for remand, as this Court is not permitted to reweigh the evidence, but instead must simply determine whether substantial evidence supports the ALJ's conclusion. *See, e.g., Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997) (noting that "where conflicting evidence allows reasonable minds to

---

[5] The Court notes that Plaintiff's argument is not particularly developed on this point, as he devotes most of his briefing to his arguments that the ALJ committed specific errors in handling the opinion evidence and in her credibility determination. But Plaintiff does additionally suggest in passing throughout his briefing that the ALJ also erred because the evidence in the record supports his claim that he is disabled. The Court therefore first addresses these arguments, and the record evidence to which Plaintiff points for support.

differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) ("Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled.") (internal citations and quotations omitted).

The ALJ here considered Plaintiff's testimony and the records documenting his complaints of pain and his alleged physical limitations throughout the relevant period, including the 2011 records to which Plaintiff points, but found that, based on her review of the entire record, those claimed limitations were not substantiated. It is not this Court's roll to second guess this determination, but simply to determine whether it was supported by substantial evidence. Given the records throughout the relevant period to which the ALJ pointed, which demonstrate largely normal physical examinations and functional capabilities, and Plaintiff's lack of continuous treatment, the Court finds that that ALJ's determination that Plaintiff's conditions caused no more than mild limitations is supported by substantial evidence.

As to Plaintiff's suggestion that the ALJ failed to confront certain favorable evidence, specifically the December 2009 x-ray interpretation from Dr. Wigderson noting no "definitive" healing in his fractured clavicle, this too is not grounds for a remand. "Although an ALJ may not ignore an entire line of evidence in reaching [her] opinion, [she] also 'need not mention every piece of evidence, so long [as she] builds a logical bridge from the evidence to [her] conclusion.'" *Poole v. Colvin*, No. 12 C 10159,

2016 WL 1181817, at *7 (N.D. Ill. Mar. 28, 2016) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). It is true that the ALJ did not specifically discuss Dr. Wigderson's December 2009 x-ray interpretation. But, as the Commissioner points out in its response, the ALJ did cite to the entire exhibit that contained the note as part of her conclusion that Plaintiff had appeared to recover from his clavicle fracture and fixation. *See* [27] 13; [6-1] 53 (citing [6-1] 430-491). And, as the Commissioner further notes, that same exhibit contained other interpretations of Plaintiff's x-rays finding that Plaintiff's injury was healing, including another interpretation in December 2009 which found "some slight progressive healing." *See* [27] 13 (citing [6-1] 453, 460). Further, as noted above, the ALJ did discuss other record evidence in 2011 and beyond in which Plaintiff complained of his ongoing shoulder pain, and she also discussed the record evidence demonstrating Plaintiff's complaints of pain related to his other impairments, such as his back pain and elbow pain. The ALJ ultimately found this evidence and Plaintiff's claims about his limitations unconvincing, in light of the record evidence as a whole, which included numerous physical examinations and tests showing that Plaintiff had typically normal physical capacity. *See* [6-1.] 53-53 (citing [*Id.*] 886-975; 976-1007; 1026-1034; 1036-1082; 1097-1109).

In sum, the Court finds that the ALJ's failure to explicitly discuss a particular contrary x-ray interpretation in 2009, which predates the relevant time period by two years,[6] is not grounds for remand. Plaintiff does not point to other records that the

---

[6] As Plaintiff's brief does not challenge the ALJ's determination that there was not good cause to reopen his previous disability determination, he has forfeited any challenge to that

ALJ failed to consider, nor does he ever claim that the ALJ ignored "entire lines" of contrary medical record evidence.[7] Further, the ALJ discussed several records from medical providers discussing Plaintiff's shoulder condition that post-date the 2009 x-ray interpretation, such as the 2012 EMG and nerve conduction study which showed only mild carpal tunnel syndrome, and the 2015 medical consultation which found "mild tenderness" in Plaintiff's right clavicle and elbow, but otherwise returned largely normal results, including normal range of motion, strength, and reflexes. *See* [6-1] 53-54 (citing [*id.*] 1004-1004, 1008-1011). Plaintiff never explains why the earlier 2009 record is more significant or determinative than these post 2009 examination records.

Regardless, considering the record as a whole the Court finds that the ALJ sufficiently reviewed and discussed the medical evidence, which included evidence favorable to Plaintiff, and built an accurate and logical bridge to her conclusion that Plaintiff did not have a severe impairment or combination of impairments. *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) (holding no error where "the ALJ focused solely on a 2003 MRI and did not discuss a 2006 MRI" because the "failure to discuss the 2006 MRI matter[ed] little in light of [claimant's] treating physicians'

---

aspect of the ALJ's decision. *See Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. 2006) (the failure to raise an argument in an opening brief constitutes a waiver of that argument). Therefore, Plaintiff has conceded that his alleged disability period begins on December 6, 2011. This does not mean all evidence from before December 2011 is irrelevant to the ALJ's determination, and indeed the ALJ considered pre-2011 evidence. But the fact that the x-ray predates the relevant period by two years does somewhat undercut Plaintiff's suggestion that it is "significant" contrary evidence that the ALJ was required to address.

[7] Insofar as Plaintiff argues that the ALJ failed to "consider" the opinions of Dr. Boll or the state agency consultants, the ALJ's determination to afford those opinions "little" and "no weight" is not what courts mean by "ignoring" contrary evidence. Rather, the ALJ addressed that contrary evidence head on, and appropriately discounted it, as discussed further below.

consistent description of her condition as mild or benign"); *Poole,* 2016 WL 1181817, at *7 (finding the ALJ did not commit an error in failing to discuss a 2009 x-ray interpretation favorable to the plaintiff, when the ALJ did address a subsequent medical consultation which incorporated the results of the prior x-ray and found only mild functional limitations). Under the deferential standard of review the Court is required to follow, this is sufficient. *See Craft,* 539 F.3d at 673 ("the ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled.")

**B. The ALJ did not err by failing to address Plaintiff's RFC.**

As to Plaintiff's additional claim that the ALJ committed a legal error by failing to continue the sequential evaluation to the RFC stage, the Court can dismiss this argument out of hand. Plaintiff devotes several paragraphs to arguing that, based on the medical record and opinion evidence, the ALJ should have made an RFC assessment that he was unable to perform "light work" as defined in the regulations implementing the act. [18] 11-13. Plaintiff goes on to argue that he should have been assessed with, at best, a sedentary RFC, and that the ALJ committed an error by failing to assess Plaintiff under the Medical Vocational Framework or "Grid rules," under which he would have been found disabled based on his age, skill level, and education. [*Id*] 12.

But Plaintiff's argument is misplaced. It is true that the ALJ never made an RFC determination or assessed the Grid rules, but instead stopped the evaluation at step two after determining there was insufficient evidence that Plaintiff had a severe

impairment. But this does not constitute an independent legal error for the Court to review. Rather, this Court's review is "limited to deciding whether the ALJ's decision to stop the sequential analysis at step two . . . was supported by substantial evidence." *White v. Barnhart*, No. 03-C-522-C, 2004 WL 635732, at *7 (W.D. Wis. Feb. 23, 2004), subsequently aff'd, 415 F.3d 654 (7th Cir. 2005); *see also Garmon v. Apfel,* 210 F.3d 374 (7th Cir. 2000) ("because the ALJ determined that [plaintiff] did not establish step two, the ALJ's analysis never reached step three. Therefore, we can only decide whether the ALJ's decision to stop the sequential analysis at step two, i.e., that [plaintiff] did not have a severe impairment, was supported by substantial evidence."). The Court cannot make findings of fact in the first instance regarding Plaintiff's RFC, and Plaintiff's arguments about his RFC and what the ALJ should have done with the Grid rules are ultimately irrelevant to the only question properly before this Court: whether substantial evidence supported the ALJ's finding that he did not have a severe impairment or combination of impairments. *See White*, 2004 WL 635732, at *7.[8]

Plaintiff is correct that the Seventh Circuit has repeatedly cautioned that the step two inquiry is only "a *de minimis* screening for groundless claims," *see, e.g., Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016), and that the SSA itself has stated that "[g]reat care should be exercised in applying the not severe impairment concept." SSR 85-28 ("If an adjudicator is unable to determine clearly the effect of an

---

[8] Plaintiff also argues that the ALJ should have considered Dr. Boll's and Plaintiff's statements regarding his functional limitations to determine his RFC. The Court addresses Plaintiff's contentions related to the ALJ's handling of the opinion evidence and his testimony below.

impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued."). However, as one court observed, this does not mean that step two is a "toothless tiger." *See Grisanzio v. Berryhill*, No. 16 CV 50197, 2017 WL 6988660, at *2 n.3 (N.D. Ill. Dec. 18, 2017) ("Claims can be denied at Step 2 and upheld on appeal."). This Court is ultimately still bound to uphold the ALJ's decision if it is supported by substantial evidence. The Court finds, for the reasons stated herein, that it was. Therefore it was not an error for the ALJ to stop her analysis at step two.

## II. The ALJ did not commit any legal error in weighing the opinions of Dr. Boll or the state agency consultants.

In addition to generally arguing that the ALJ failed to build the requisite logical bridge between the evidence and her conclusion, Plaintiff devotes a significant portion of his briefing to arguing that the ALJ committed harmful legal error in assigning "little weight" to the state agency consultants, and "no weight" to the opinion of his treating physician Dr. Boll. *See* [6-1] 54-55; [18] 9-11, 13-14. The Court addresses Plaintiff's arguments with respect to each opinion below.

### A. The ALJ did not err in assigning Dr. Boll's opinion no weight.

In general, a "treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is 'well-supported' by medical findings and 'not inconsistent with the other substantial evidence' in the record." *Sonji L. v. Kijakazi*, No. 19 C 4109, 2022 WL 672741, at *5 (N.D. Ill. Mar. 7, 2022) (quoting 20 C.F.R. § 404.1527(c)). "If a treating physician's opinion is not given

controlling weight, the ALJ must determine what weight it merits by considering the following factors: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; and (4) the consistency and supportability of the opinion." *Id.* (citing *Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018); 20 C.F.R. § 404.1527(c)). Further, the ALJ "must offer good reasons" for giving a treating physician's opinion less than controlling weight. *See Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). However, while the ALJ must "consider the factors found in found in 20 C.F.R. §. 404.1527(c)," he need only "minimally articulate" his reasoning, and the ALJ "need not explicitly discuss and weigh each factor." *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (noting that this is a "very deferential standard" which the Seventh Circuit has described as "lax.")).

Plaintiff suggests that by affording Dr. Boll's opinion "no weight," the ALJ impermissibly "played doctor" and substituted her own judgment for that of Plaintiff's treating physician. [18] 14. Plaintiff further argues that the ALJ failed to follow the appropriate process for reviewing the treating physician opinion discussed above, because after the ALJ declined to give Dr. Boll's opinion "controlling weight" as a treater, she was not permitted to "simply disregard it," but was required to proceed in the analysis and determine what specific weight it should be given. [*Id.*] 13-14. Finally, Plaintiff argues that the ALJ was incorrect to claim that "[t]he record contains no examination notes from Dr. Boll and therefore it is not clear what, other than the claimant's reporting, Dr. Boll based his opinion on." [*Id.*] 14 (citing [6-1] 54-

55). Plaintiff points to Dr. Boll's note on the assessment form that Plaintiff had "4-5/5 strength at best in extremities," and an "abnormal blood test result" taken at one of his examinations as evidence that his opinion is supported by examination notes. [*Id.*] (citing [6-1] 1115, 1121).

Plaintiff's arguments are without merit. It is true that, as a treating physician, Dr. Boll's opinion was entitled to controlling weight unless the ALJ set forth "good reasons" for assigning it a lesser weight. *Stage*, 812 F.3d at 1126. But that is precisely what the ALJ did here. The ALJ noted that Dr. Boll's opinion that Plaintiff's symptoms would "frequently" interfere with the concentration and attention required to perform simple work tasks, was not supported by any examination notes, and therefore it was unclear what, other than Plaintiff's subjective reporting, Dr. Boll had based his opinion on. [6-1] 54-55. The ALJ further noted that Dr. Boll had expressly declined to offer an opinion on Plaintiff's functional abilities, stating that he "had not examined the claimant in such a way as to describe specific physical limitations." [6-1] 54-55. In other words, though she may not have used the precise language from the case law or regulations, the ALJ found that Dr. Boll's opinion was not "well-supported" by medical findings, and she was therefore not required to give the opinion "controlling weight." *See Sonji L.*, 2022 WL 672741, at *5; *see also Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) ("An ALJ is not required to accept a doctor's opinion if it "is brief, conclusory, and inadequately supported by clinical findings."); *Ephrain S. v. Berryhill,* 355 F. Supp. 3d 738, 746 (N.D. Ill. 2019) ("an ALJ can reject a doctor's opinion if it is not supported by treatment notes or the record as

a whole, or if it appears to be based on the patient's subjective allegations") (internal citations omitted).

As the ALJ did not afford Dr. Boll's opinion controlling weight, she was then to determine what weight it did merit by considering the factors outlined in 20 C.F.R. § 404.1527(c). *Sonji L.*, 2022 WL 672741, at *5 (citing *Gerstner*, 879 F.3d at 263). The ALJ's findings discussed above—that Dr. Boll's opinion was not well supported due to the lack of examination notes and his admission that he had not conducted an exam in such a way to opine on Plaintiff's physical limitations—go directly toward one of those factors: "the consistency and supportability of the opinion." *See id*; 20 C.F.R. § 404.1527(c)(3)-(4). Further, the ALJ additionally noted that Dr. Boll had only seen Plaintiff on two occasions in 2017, which goes to another of the factors: "the length, nature, and extent of the treatment relationship." *See Sonji L.*, 2022 WL 672741, at *5; 20 C.F.R. § 404.1527(c)(2)(iii). The ALJ thus did consider some of the regulatory factors, albeit not explicitly, and found based on those factors that Dr. Boll's opinion should be afforded no weight. [6-1] 54-55 ("Given this lack of support and very short treating relationship, the undersigned gives Dr. Boll's opinion no weight.").

To be sure, the ALJ's opinion here could have been more thorough and provided a more detailed analysis of all the relevant factors. But, while the ALJ must consider the relevant factors discussed above, the Seventh Circuit case law is clear that she need only "minimally articulate" her reasoning, and she need not explicitly discuss and weigh each factor. *See Collins*, 743 F. App'x at 25 (citing *Elder*, 529 F.3d at 415). Contrary to Plaintiff's suggestion then, the ALJ was not required to conduct a

systematic analysis wherein she first explained why she was not offering Dr. Boll's opinion controlling weight, and then reviewed and weighed each of the applicable factors to determine what weight it should be afforded. The Court thus finds that the ALJ satisfied the requirement that she consider the regulatory factors and "minimally articulate" her reasoning, and therefore her decision to afford Dr. Boll's opinion no weight must stand. *Bailey v. Colvin*, No. 3:14-CV-01709-CAN, 2015 WL 4093347, at *4 (N.D. Ind. July 7, 2015) ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ '"minimally articulate[d]' his reasons—a very deferential standard that we have, in fact, deemed 'lax.'") (citing *Berger*, 516 F.3d at 545).

Finally, the Court notes that it is not persuaded by the examples cited by to counter the ALJ's statement that Dr. Boll's opinion was unsupported by examination notes. The Court has reviewed the records, and the ALJ is correct that the medical records from Plaintiff's April and May 2017 treatments with Dr. Boll contain no notes of any physical examination, or any indication as to the basis of his opinions on the assessment form that Plaintiff's symptoms would "frequently" interfere with his ability to concentrate and perform simple work tasks. [*Id.*] 1112-1119. Nor is there any explanation in the records as to the meaning behind the specific statement that that Plaintiff had "4-5/5 strength at best in extremities." [*Id.*]. Indeed, Dr. Boll's other statement that he had not conducted an examination such as to offer an opinion on Plaintiff's physical limitations greatly undercuts any suggestion that the ALJ should have afforded any statement about Plaintiff's physical strength any weight

whatsoever. Further, as the Commissioner rightly observes, Dr. Boll's opinions on the form make no mention of the "abnormal blood test" that is reflected in the underlying records, nor does Plaintiff offer any explanation as to how that blood test bears any relation to Dr. Boll's opinion or to any of the functional limitations Plaintiff has claimed. [27] 11.

In sum, the Court's review of the ALJ's opinion and the record does not indicate that the ALJ was impermissibly "playing doctor" by substituting her own judgment for that of Dr. Boll. Rather, the ALJ performed her duty to weigh and consider the evidence. *Patricia B. v. Berryhill*, No. 17 CV 50201, 2019 WL 354888, at *2 (N.D. Ill. Jan. 29, 2019) ("An ALJ plays doctor by ignoring relevant medical evidence and using his judgment to make his own medical findings; in contrast, he does *not* play doctor when he discusses and weighs the medical evidence and makes appropriate inferences from that evidence.") (citations omitted). The ALJ was not required to accept Dr. Boll's opinion simply because he was a treater. The Court finds the ALJ sufficiently explained her reasoning for affording his opinion no weight, and that the ALJ's determination to afford that opinion no weight was supported by substantial evidence.

**B. The ALJ did not err in weighing the state consultants' opinions.**

Plaintiff argues the ALJ committed a similar error in assigning "little weight" to the opinions of two state agency medical consultants who opined that Plaintiff had several severe medical impairments and was only capable of performing medium work. Plaintiff argues that the ALJ again impermissibly "played doctor" and

substituted her judgment for that of the state agency medical consultants, and that the ALJ's opinion was "internally inconsistent" because she also assigned the state psychological consultant's opinion "great weight." [18] 9-11, 14. The Court disagrees.

An ALJ is permitted to assign weight to a non-treating physician's opinion based on the regulatory factors discussed above, including the "claimant's examining and treatment relationship with the source of the opinion; the physician's specialty; the support provided for the medical opinion; its consistency with the record as a whole and any other factors that tend to support or contradict the opinion." *Bailey*, 2015 WL 4093347, at *4 (internal citations omitted). This process applies to opinions by state agency physicians or psychologists. *Id.* As with the above, if the ALJ discounts a state agency physician's opinion after consideration of the applicable factors, the Court must allow that decision to stand so long as the ALJ "minimally articulate[d]" her reasoning. *Id.* (citing *Berger*, 516 F.3d at 545).

Here, the ALJ noted that Dr. Reddy and Dr. Jarrad did not examine Plaintiff, nor did they have the opportunity to review the additional medical evidence received at the hearing level. [6-1] 54. Further, the ALJ found that "the record as a whole, as discussed above, does not support the conclusion that the claimant has severe physical impairments." [*Id.*]. In other words, the ALJ incorporated her prior detailed analysis of the records related to all of Plaintiff's claimed impairments, including the consultative and treatment records showing normal physical examinations and only mild functional limitations, and found that those records were inconsistent with the state consultants' opinions that Plaintiff had severe impairments. Although again,

the ALJ's analysis could have been more thorough, she was not required to explicitly discuss and weigh each factor, but merely to "minimally articulate" her reasons, which is a "very deferential standard" that the Seventh Circuit has described as "lax." *See Collins*, 743 F. App'x at 25; *Elder*, 529 F.3d at 415. The ALJ satisfied that requirement here: by noting the lack of examination and access to the full amount of medical records, and the inconsistency with the record as a whole, the ALJ was considering, though not explicitly, some of the regulatory factors outlined above. Based on her consideration of those factors, the ALJ decided to afford the consultant's opinions "little weight," which is a determination the Court must allow to stand since the ALJ "minimally articulated" her reasoning. *Bailey*, 2015 WL 4093347, at *4 (citing *Berger*, 516 F.3d at 545).

The Court also disagrees with Plaintiff's claim that the ALJ's logic here is "internally inconsistent" because she afforded Dr. Gilyot-Montgomery's opinion "great weight." Where the ALJ found that Dr. Reddy and Dr. Jarrad's opinions were not consistent or supported by the record as a whole, she found Dr. Gilyot-Montgomery's opinion was consistent and supported by the record. [6-1] 54. Specifically, the ALJ noted that Dr. Gilyot-Montgomery's opinion that Plaintiff's mental impairments were not severe and caused no more than mild limitations was consistent with the record evidence as a whole that Plaintiff's symptoms had been "largely controlled with conservative treatment." [*Id.*]; *compare* [*id.*] 113-114 (noting Dr. Gilyot-Montgomery's observation that Plaintiff "has never seen a psychiatrist or therapist and has never been hospitalized for treatment of a psychiatric disorder,"

and that his depression and anxiety are "mild" and treated only with medication); *with* [*id.*] 1108 (Plaintiff reporting to Dr. Morris-Christian that he had not seen a psychiatrist and was not taking his anxiety medication as prescribed); 1098 (Plaintiff reporting to Dr. Morris-Christian that he was not on an antidepressant anymore and only taking his anti-anxiety medication "here and there").

The ALJ was not being inconsistent or "playing doctor" by comparing and weighing the different consultant's opinions differently based on whether they were supported by the medical record as a whole. Rather that is exactly what the ALJ is supposed to do. *See, e.g., Thorps v. Astrue*, 873 F. Supp. 2d 995, 1005 (N.D. Ill. 2012) ("Of course an ALJ may not substitute his own judgment for a physician's without relying on other medical evidence on record. An ALJ, however, is not only allowed to, he must, weigh the evidence, draw appropriate inferences from the evidence, and, where necessary, resolve conflicting medical evidence."); *Armstrong v. Barnhart*, 287 F. Supp. 2d 881, 886-87 (N.D. Ill. 2003) ("Our review of the record indicates that the ALJ was not 'playing doctor,' but performing his duty to consider and weigh the evidence."); *see also Davis v. Barnhart*, 187 F. Supp. 2d 1050, 1057 (N.D. Ill. 2002) (an ALJ must "evaluate, not simply accept, medical evidence" and "critically evaluat[e] the doctors' opinions and the conflicting [medical] records".).

In sum, the Court finds that the ALJ did not err in how she weighed the opinions of the state agency medical consultants. The ALJ examined the opinions in light of the record as a whole, and "minimally articulated" her reasoning for the weight she ultimately assigned.

### III. The ALJ's credibility determination was not patently wrong.

Finally, Plaintiff argues that the ALJ committed a "harmful legal error" in her assessment of the credibility of Plaintiff's subjective statements and testimony related to his physical limitations. Plaintiff generally alleged in his disability application that he could lift only 10 pounds and walk only "one street and back," before needing to rest. [6-1] 52. He further testified at his hearing that his right arm hurts constantly and sometimes has a tremor, and that he does not sleep well and has difficulty concentrating. [*Id*]. The ALJ ultimately found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were "inconsistent with the objective medical evidence, his course of treatment, his statements to medical providers about his impairments, and his daily activities." [*Id*] 54.

This Court generally must accord "special deference" to the ALJ's credibility determination, because she "is in the best position to see and hear the witness and determine credibility." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 631 (N.D. Ill. 2009) (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). For that reason, the Court may only overturn the ALJ's adverse credibility determination if it is "patently wrong." *Elder,* 529 F.3d at 413-14. A credibility determination is "patently wrong" if it "lacks any explanation or support." *Id*. An ALJ's determination regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator

gave to the individual's statements and the reasons for that weight." *See* SSR 96–7p (S.S.A. 1996).

Here, Plaintiff argues that the ALJ was patently wrong because she failed to confront evidence related to his ongoing pain, including the December 2009 x-ray interpretation discussed above, and therefore erred in finding his allegations inconsistent with the objective evidence. [18] 15. Plaintiff further argues that the ALJ was wrong to rely on Plaintiff's lack of treatment as evidence that his symptoms where not as severe as he claimed, because Plaintiff had been in dire financial straits and could not always afford treatment. [35] 1. Plaintiff argues that the ALJ was "obligated to assess why [Plaintiff] may not have been able to pursue treatment before she drew a negative inference of credibility," and that the ALJ's determination is "patently wrong" because she failed to assess his reasonings for failing to pursue treatment. [*Id.*] 5.

As to Plaintiff's first point, the Court has already discussed above the ALJ's failure to discuss the particular 2009 x-ray interpretation to which Plaintiff points. To reiterate: the ALJ is not required to address every piece of evidence in the record, and the fact that the ALJ did not explicitly refer to one individual treatment note two years prior to the relevant time period does not mean the ALJ's decision was not supported by substantial evidence, where she conducted a thorough review of the record as a whole, including other records that supported Plaintiff's claims, but nonetheless found the evidence did not support his claims as to the intensity and severity of his conditions. *See, e.g., Senn v. Astrue,* No. 12-C-326, 2013 WL 639257, at

*6 (E.D. Wis. Feb. 21, 2013) ("an ALJ is not required to address in writing every piece of evidence or testimony presented"); *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021) ("the presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence"); *Stenholtz v. Saul*, No. 20-C-1254, 2021 WL 5206585, at *1 (E.D. Wis. Nov. 8, 2021) ("it is hardly surprising that plaintiff is able to identify some evidence supporting her claim the ALJ did not mention. But this is not a case where the ALJ simply ignored all of the favorable evidence.").

Regarding Plaintiff's lack of treatment, Plaintiff is correct as a general matter that an ALJ must inquire into a claimant's reasons for not seeking medical treatment before drawing negative inferences from it, including for example a lack of health insurance or inability to pay. *See, e.g., Wherry v. Colvin,* No. 15-CV-419-CJP, 2016 WL 3570596, at *7 (S.D. Ill. July 1, 2016) ("It is true that an ALJ must consider a claimant's lack of health insurance before concluding that a failure to seek treatment means that treatment was not needed"); *Senn*, 2013 WL 639257, at *5 ("SSR 96–7p cautions the ALJ about drawing adverse inferences from a lack of treatment without first taking into account a claimant's explanation such as lack of access to free or low-cost medical services"). However, "this does not translate into a blanket rule that an ALJ must accept as credible all allegations of a claimant who is without health insurance," nor that the ALJ is required to accept Plaintiff's reasoning. *See Wherry*, 2016 WL 3570596, at *7. All that is required is that the ALJ consider those reasons, and "provide an 'accurate and logical bridge' between the

evidence and the conclusion." *Senn*, 2013 WL 639257, at *5 (citing *Craft*, 539 F.3d at 673).

The ALJ has satisfied that requirement here. The ALJ noted that "[a]t hearing, the claimant indicated that some of his lack of treatment was the result of difficulties finding providers covered by insurance." [6-1] 54. The ALJ went on to state though, that "the record shows that the claimant still received care from his primary care provider, often without mentioning any of the conditions discussed above." [*Id.*]. Further, the ALJ noted, as she discussed previously, that the "the physical and mental examinations the claimant did have during the relevant period were largely unremarkable and suggest that the claimant is not as functionally limited as he has alleged, even without treatment." [*Id.*]. Finally, the ALJ stated that the record "contains no opinions during the relevant period from any treating or examining source physician indicating that the claimant is disabled." [*Id.*]

The ALJ thus did consider Plaintiff's explanation that at least some of his lack of treatment was due to difficulties in finding providers covered by his insurance, but nonetheless found that his subjective statements about his impairments were not consistent with record as a whole. The Court acknowledges that the ALJ's discussion here was limited and contained to a single paragraph, and that the ALJ did not expressly discuss all of the evidence in the record related to Plaintiff's financial difficulties.[9] But, the fact that the ALJ asked Plaintiff about his insurance coverage

---

[9] For example, Plaintiff notes that various treatment notes throughout the relevant period reflect Plaintiff's difficult financial situation, such as him losing his job, [18] 3 n.2, and being unable to pursue certain treatments due to finances. [35] 4 (citing [6-1] 526).

and reasons for failing to seek treatment at the hearing, *see* [*id*.] 1150, 1157, along with the fact that the ALJ's opinion directly confronts Plaintiff's alleged difficulty in finding providers covered by his insurance, [*id*.] 54, demonstrate that the ALJ did expressly consider Plaintiff's explanation for his lack of treatment as she was required to do. And further, the Court cannot say that the ALJ's explanation for why she was discounting that explanation "lacks any support." Rather, the ALJ cited to the specific evidence of Plaintiff's continued treatment with his primary care provider without mentioning his claimed conditions, along with the normal physical and mental examinations during the period. The ALJ thus "provided specific reasons for [her] finding on credibility," and those reasons are "sufficiently specific to make clear the weight that was given to [Plaintiff's] testimony and the reasons for that weight." *See Senn*, 2013 WL 639257, at *6. This is all that is required. *See id.*; *see also Vivian T. for Estate of Robert T. v. Saul,* 2021 WL 2529611, at *5 (N.D. Ill. June 21, 2021) (the ALJ "appropriately discounted Plaintiff's complaints in part because of his lack of attempts to get treatment during the relevant time period" where "the ALJ gave Plaintiff an opportunity to explain his lack of treatment, and Plaintiff did not testify that he was prevented from seeking needed care.").

The Court therefore concludes that the ALJ was not patently wrong in her credibility determination.

## Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment [17] is denied, the Commissioner's motion for summary judgment [26] is granted, and the Commissioner's decision denying Plaintiff's application for benefits is affirmed.


**HEATHER K. McSHAIN**
**United States Magistrate Judge**


**DATE: April 21, 2022**